UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
CORPUS CHRISTI DIVISION

MELINDA L. MANSELL,               §
   Plaintiff                         §
                                  §
vs.                               §   CIVIL ACTION NO. C-11-344
                                  §
MICHAEL J. ASTRUE,                §
COMMISSIONER OF SOCIAL            §
SECURITY,                         §
   Defendant                         §

## MEMORANDUM AND RECOMMENDATION

Melinda L. Mansell filed a complaint seeking reversal of the decision of the

defendant Commissioner of Social Security for the purpose of receiving Disability Insurance

Benefits.  Plaintiff filed a motion for summary judgment on March 12, 2012 (D.E. 11) to

which defendant responded on April 6, 2012 (D.E. 12).

## BACKGROUND

Plaintiff filed her application on February 27, 2007 and it was denied at all

administrative levels (Tr. 113-117, 124-128, 98-107, 10-20, 1-3).[1]  Plaintiff filed this action

in federal court on October 19, 2011 (D.E. 1).  She alleges an inability to work from her

onset date of February 1, 2005 because of fibromyalgia, a pain disorder, obesity and other

hyperalimentation (Tr. 96, 97).  Her reported symptoms include pain all over her body, an

inability to raise her arms, fatigue, heel spurs and swelling and numbness in her legs (Tr.

---

[1]After the first administrative hearing held on November 20, 2008 the
Administrative Law Judge ("ALJ") found plaintiff not disabled.  Plaintiff sought review
by the Appeals Council, which remanded the case for another hearing (Tr. 108-112).
Following a second administrative hearing the ALJ again found plaintiff not disabled (Tr.
10-20).

253).  Prior to the onset of her disability, plaintiff worked as aviation mechanic, customer service representative, sewing machine operator, order filler, bottle filler and labeler, fab and flip chip operator, telemarketer, cotton tray filler, janitor and stocker in a grocery store, cotton tester and front desk representative (Tr. 279).

## MEDICAL EVIDENCE

Plaintiff was seeing a rheumatologist for fibromyalgia at least as early as March 2000.  At that time she was complaining of pain in her left shoulder and could not keep her arms elevated.  She also complained of abdominal pain which the doctor attributed to endometriosis.  She had diffuse tenderness compatible with fibromyalgia, bicipital tendinitis and diffuse tenderness to the soft tissue of the shoulders without obvious impingement.  The doctor advised that she stay active without overdoing it and recommended physical therapy and work hardening.  He was going to write a note for her employer asking that she be placed in a less vigorous job with limited overhead lifting (Tr. 310).

In November 2000 the rheumatologist noted that plaintiff's arms were feeling better with less pain, but she had developed psoriasis and right plantar fascitis.  He recommended she see a podiatrist.  She was taking Vioxx, Prilosec, Sonata, Neurontin and Synthroid (Tr. 311).  She later was diagnosed with heel spurs (Tr. 313).  Plaintiff saw a neurologist in November 2000 who noted that she had a history of peripheral neuropathy and evidence of a left Saphenous neuropathic pain, in addition to fibromyalgia and pain in her right plantar region (Tr. 332).

In January 2001 she complained of non-specific abdominal pain and diffuse tenderness compatible with fibromyalgia.  She was limited to manual labor but was trying to move into a more sedentary job (Id.).  In May 2001 the doctor noted that the Vioxx had helped with her pain but she still had diffuse tenderness.  She also had headaches revolving around her right eye and abdominal pain (Tr. 315).  He reported that the Neurontin had provided significant relief of her symptoms (Tr. 332).  She still was having sensory problems (Tr. 333).  The doctor was going to give her a letter for her employer, asking that she be allowed to take frequent breaks, or at least be allowed to sit down periodically and not walk, in order to relieve the pain in her feet (Tr. 333).

In March 2002 a uterine CAT scan showed an abdominal mass, later determined to be fibroid (Tr. 317, 361).  She still had symptoms of fibromyalgia (Tr. 317).  In April 2002 plaintiff underwent a total hysterectomy, a left salpingo-oophorectomy and lysis of adhesions (Tr. 361).  It was noted at the time of her surgery that plaintiff had Graves' disease, fibromyalgia, peripheral neuropathy and high cholesterol (Tr. 362).

Plaintiff continued to see the neurologist and in November 2002 he reported that she was feeling much better, but with some parathesia in her left extremity when she was sitting. She had discontinued the Neurontin and Vioxx and was doing well.  She had some stiffness in her whole body but with good tolerance.  She was to be seen on an as needed basis (Tr. 327).

In November 2003 plaintiff underwent a general physical examination at the request of the Texas Rehabilitation Commission.  It was noted that she had fibromyalgia, Graves'

3

disease, neuropathy and blood in her urine.  Plaintiff's examination was normal (Tr. 539).

The doctor performed a functional assessment and determined that plaintiff could sit and

stand continuously, lift up to twenty pounds frequently and up to fifty pounds occasionally,

and could occasionally bend, stoop, kneel, squat, crouch, crawl, climb and balance (Tr. 540).

Plaintiff also underwent a psychiatric evaluation by Burton Kittay, PhD, in November

2003.  After conducting a mental status examination and several tests, the psychologist

assessed plaintiff with chronic pain disorder associated with both psychological factors and a

general medical condition, a panic disorder without agoraphobia, a mathematics disorder and

a disorder of written expression.  She had a GAF of 59.[2]  Under "functional limitations" it

was noted that she might have difficulty managing financial obligations or taking notes in

school, may become highly anxious during stressful events, such as taking school exams or

interviewing for jobs, and that her medical problems might affect her ability to attend school

or work on a daily basis (Tr. 541-544).

Plaintiff saw a psychologist in Dr. Kittay's office for treatment in 2004 and early

2005.  Most of the sessions involved suggestions for ways plaintiff could reduce anxiety and

handle problems (Tr. 416-418, 421-425).

In January 2005 plaintiff saw Patricia Lane, M.D., to whom she complained of hand

pain and swelling after doing some mopping and lifting at work.  The pain felt different from

---

[2]The Global Assessment of Functioning ("GAF") Scale rates overall psychological
functioning on a scale of 0-100.  A GAF of 51-60 indicates moderate symptoms (e.g., flat
affect and circumstantial speech, occasional panic attacks) OR moderate difficulty in
social, occupational or school functioning (e.g., few friends, conflicts with peers or co-
workers).  Diagnostic and Statistical Manual of Mental Disorders, Fourth Ed., 2000.

her fibromyalgia pain and did not respond to Celebrex (Tr. 381).  Also, despite an abnormal

liver function test, an ultrasound of plaintiff's liver performed on December 30, 2004 was

unremarkable (Tr. 377).

In February 2007 plaintiff complained that she had body aching and weakness which

had begun five months earlier (Tr. 432).  On May 16, 2007 plaintiff underwent a disability

examination.  It was noted that she suffered from fibromyalgia, neuropathy, Graves' disease,

acid reflux, depression, high blood pressure and high cholesterol (Tr. 449).  She had a

normal gait and station with no signs of ataxia or unsteadiness, but she was unable to stand

on her heels or toes without difficulty.  She was able to bend all the way over and get back

up.  She was unable to squat down and get back up.  Her straight leg raise was positive at

fifty percent degrees bilaterally with pain in her legs.  There was tenderness to palpation

along the spine in the cervical, thoracic and lumbar areas, but with normal range of motion.

Her extremities showed no joint tenderness or enlargement and she had a normal range of

motion.  There were multiple musculoskeletal tender points in the typical areas that are

noted for fibromyalgia (Tr. 450).

Motor strength in the lower extremities was 4/5 bilaterally and in the upper

extremities it was 5/5.  Her deep tendon reflexes were symmetric and normal.  Her handgrip

was 4/5 bilaterally.  Her fine finger movements were normal and she was able to handle

small objects and manage buttons.  Her sensory exam was symmetric and normal (Id.).  The

assessment was fibromyalgia and neuropathy in the left lower leg by history (Tr. 451).

A psychiatric review technique concluded that plaintiff had anxiety-related disorders and somatoform disorders and needed to undergo a mental residual functional capacity ("RFC") assessment (Tr. 453-462).  She had mild restrictions in her activities of daily living and mild difficulties in maintaining social functioning.  She had moderate difficulties in maintaining concentration, persistence or pace.  She had no episodes of decompensation (Tr. 463).  Her current mental status examination showed her memory and concentration were fair and she was independent in her activities of daily living.  Her GAF was 55.

A mental residual functional capacity ("RFC") assessment done on June 6, 2007 concluded that plaintiff could understand, remember and carry out only simple decisions, attend and concentrate for extended periods, accept instructions, and respond appropriately to changes in a routine work setting (Tr. 467-469).  A physical RFC done on June 7, 2007 concluded that plaintiff could lift 20 pounds occasionally and 10 pounds frequently, could stand, walk and sit with normal breaks for about six hours in an eight-hour workday and had an unlimited ability to push and pull.  Plaintiff had no postural, manipulative, visual, communicative or environmental limitations (Tr. 471-476).

Plaintiff underwent a sleep study in May 2008 because of snoring and fatigue and her thyroid history.  She was assessed with severe obstructive sleep apnea.  She was warned about hypersomnolence and advised against driving when sleepy and avoiding alcohol and sedatives prior to sleep onset (Tr. 538).  Plaintiff returned for another sleep study in August 2008, utilizing a CPAP unit.  The clinical indications were that the CPAP unit greatly

6

improved her quality of sleep and it was recommended that she use one when sleeping (Tr. 560-561).

Plaintiff saw a doctor at Amistad community health center in July 2008. She reported shortness of breath exacerbated by exertion. She also said she had stabbing, intermittent lower back pain radiating to both legs. She had had the pain for the previous four months and it was worse when she walked (Tr. 574-575). She also complained of chest pain, headaches, polydipsia, fatigue and malaise (Tr. 576).

In January 2009 plaintiff had swelling to both lower extremities, and pain radiating to both upper arms. She also had a rash on the right side of her chest and on her left and right foot. In addition she reported head ache pain and congestion. She was noted to be in no acute distress but overweight (Tr. 581-583).

In June 2009 plaintiff was diagnosed with Type II diabetes, in addition to her previous diagnoses of high blood pressure, hypothyroidism and fibromyalgia. She had swelling in her lower extremities and complained of constant pain in both feet. She also complained of chills, fatigue, night sweats, cold intolerance, heat intolerance, excessive hunger and occasional heart palpitations (Tr. 584-586). In October 2009 plaintiff's blood pressure was elevated and her diabetes was uncontrolled (Tr. 590).

In January 2010 plaintiff complained of constipation, abdominal pains and hemorrhoids. Her examination was normal except for a rash in her groin area (Tr. 596). In February 2010 plaintiff complained of intermittent upper abdominal pain and intermittent sharp pain in her right lower leg which started at her groin and ran down her back. She also

reported cold intolerance (Tr. 598-600).  An X-ray of plaintiff's spine showed mild

degenerative changes at the L5-S1 level but no other abnormalities (Tr. 637).

In June 2010 plaintiff was taking the following medications: Levothyroxine to treat

thyroid disease; Nexium to prevent heartburn or reflux; Crestor for hypercholesterolemia,

Neurontin for nerve pain; Savella for Fibromyalgia, Guaifenesin for congestion and cough;

Ibuprofen for pain, Anusol-HC for hemorrhoids, Nystatin ointment for her groin rash,

Metformin to treat diabetes and Cozaar to control her high blood pressure (Tr. 639).

## HEARING TESTIMONY

Two hearings were held in plaintiff's case.  At the hearing held on August 25, 2008

plaintiff stated that she was 46 years old and lived with her husband, a self-employed painter

(Tr. 68-69).  She was five feet, one inch tall and weighed 220 pounds.  She completed the

tenth grade and obtained a GED.  She took some computer classes but had not done any jobs

using the computer training.  She could read the newspaper, write letters and make change at

the grocery store (Tr. 69).

She last worked full time grading cotton by color and weight.  She was terminated

because she could not work fast enough (Tr. 70).  Prior to that she worked at a paint and

body shop at the front desk, but she only held that job for two weeks.  She was unable to do

the job, but also they cut her hours to four hours a week and she did not make enough money

to live on (Tr. 70-71).  She also worked as a stocker and janitor at a grocery store.  She left

that job because it caused her a lot of pain and made her hands swell.  Her knees, legs and

back hurt because of the heavy lifting.  Also it was very stressful (Tr. 72-73).  She worked as

part of a crew at a die manufacturing company, turning silicone wafers into computer chips (Tr. 74). She mostly stood to do the job. It was an ultra clean environment and she did not use any tools. She left the job because the company closed in December 2002 (Tr. 74-75).

Plaintiff was diagnosed by a rheumatologist with fibromyalgia in approximately 2002. The fibromyalgia makes it difficult for her to walk, sit and stand because her muscles are very stiff. If she starts to fall she cannot catch herself. It is difficult for her to sleep at night because her back hurts. If she stands up too long, pain runs all the way down her back (Tr. 76). She has tried to walk around the block but it hurts too much. She feels pain and numbness shooting up and down her back and her legs feel like they want to give out. She also has muscle spasms, caused by either the fibromyalgia or the neuropathy. At one point she could not bathe herself or use the restroom without the muscle spasms (Tr. 77-78).

She does not tell her husband about the pain but just waits for it to stop. Her husband helps with the housework. It hurts when people touch her. She has good days and bad days, but most of her days are bad. She has more pain when the weather is cold or she is in a cold environment. Going to the grocery store is very painful. Her husband does the shopping and she puts her purse in the cart and holds on to the cart to walk. Getting in and out of the car hurts a lot (Tr. 79).

The neuropathy causes her to have numbness and swelling in her hands and feet. She cannot wear all of the shoes she used to wear. Elevating her feet helps sometimes, but not always. When she worked and was on her feet all day her legs would throb in the evening and made it difficult to sleep (Id.)

She also has heel spurs, which make it painful to stand and walk.  She used to fall once or twice a month but she is better now (Tr. 80).  She sleeps all the time because she cannot stay awake.  She has sleep apnea which makes her feel like she is awake all night.  She wakes herself up with loud snoring and must keep her head up.  In the morning when she wakes up she tries to do a little housework but as soon as she sits down she falls asleep for a couple of hours.  Any activity, including reading, watching television and driving, makes her sleepy.  She limits driving (Tr. 81).

She had an episode while she was sleeping in which she had thick phlegm covering her air passage and could not breathe.  She gasped for air and cleared her throat after several tries (Tr. 81-82).  The Graves disease causes her eyes to protrude and tear up and it is painful.  Also, her memory is affected and she cannot concentrate long enough to learn anything (Tr. 83-84).  She hurt her finger and the pain traveled up to her shoulders.  One effect of the fibromyalgia is that if she has pain in her left arm, her right arm will hurt in the same manner.  She can pick things up, but can only file for 30 minutes.  When she raises her arms they begin to hurt and she has to put them down.  Reaching is difficult and painful (Tr. 84-85).

She has anxiety attacks where she feels like she cannot breathe and she will have to run outside for air.  She also has been so tired of being ill that she felt suicidal.  If she cannot feel air moving around her she becomes claustrophobic and starts to panic.  She has panic attacks about three times per week.  She still likes to go fishing, but cannot go when it is cold outside (Tr. 86).

She would love to be able to work, but she cannot sit or stand for long periods of time, she has memory problems and is sleepy all the time.  While she was working as a telemarketer she fell asleep twice while at work.  Also, she cannot work in the cold and she can only do repetitive type jobs (Tr. 88-89).

The vocational expert ("VE") testified that plaintiff's work as a wafer machine operator was light and semiskilled with an SVP of 4 according to the Department of Labor.  The way she described it the job was unskilled because she was not doing all of the tasks usually involved in the job.  Her work as a customer service representative/telemarketer was sedentary and semiskilled with an SVP of 3.  Her job as a stocker/janitor was medium and unskilled.  She also worked as a bottle filler/labeler in 1996 and that job was light and unskilled (Tr. 93).

If a person missed more than two days a month of work she probably would not be able to sustain full time employment.  If a person were limited to no overhead reaching it would not eliminate the chip operator job.  If a person needed to take more than the normal number of breaks, such as fifteen minutes each in the morning and afternoon and thirty minutes at lunch, she would most likely not be able to sustain employment.  If a person were unable to squat she would not be able to do the stocker/janitor job (Tr. 94).

At the hearing held on July 26, 2010, the ALJ noted that he was going to confine questions to the matters discussed in the Appeals Council order, namely assessing the effect of her obesity and the limitations imposed by her need to make only simple and routine work

11

decisions (Tr. 31).  The first medical expert ("ME")[3] then testified that plaintiff's

impairments did not meet or equal any of the listings of impairments in the Social Security

regulations.  (Tr. 31-32).  Plaintiff is sixty-two inches tall and weighs 220 pounds, giving her

a body mass index of 38.  She is obese, but not in the morbid obesity range.  She has

diabetes with an A1-C of 7.0, which is elevated.  There is no evidence of organ damage, but

there is some question of neuropathy in her left leg, although the physical examination was

normal.  She has obstructive sleep apnea, but is being treated with a CPAP machine and it is

difficult to evaluate.  She had Graves' disease in the past but is now being treated for

hypothyroidism and does not appear to have further symptoms.  She has low back pain and

X-rays show mild degenerative changes at L5-S1.  Not taking into account the fibromyalgia

pain, which is subjective, she could do light work.  If the fibromyalgia pain were significant,

she could do sedentary work, even taking into account her obesity (Tr. 32-33).

Light work would involve lifting twenty pounds occasionally and ten pounds

frequently.  She would not have any environmental restrictions.  She would not be able to

climb ladders, ropes or scaffolds, or to work at unprotected heights or around dangerous

machinery (Tr. 33).

The ME had no way to evaluate the effects of plaintiff's fibromyalgia on her ability

to work.  With his own patients, in the absence of objective evidence of pain, the ME would

---

[3]Two medical experts testified.  The first testified about plaintiff's physical
impairments and the second testified about her mental impairments.

base his assessment on his experience with the patient and what the patient told him about the degree of pain (Tr. 35).

The second ME testified that plaintiff did not meet any of the listings for non-exertional impairments (Tr. 35-36).  She had a verbal IQ of 94, performance IQ of 114 and a full scale IQ of 103.  Tests showed plaintiff could read at a high school level, and do spelling and arithmetic at an eighth grade level.  She was diagnosed with a pain disorder associated with both psychological factors and a general medical condition.  She also was diagnosed with a panic disorder without agoraphobia, a mathematics disorder and a disorder of written expression.  The ME disagreed with the conclusion that plaintiff had learning disorders because there was insufficient evidence to support the conclusion (Tr. 36).

Based on the evidence regarding plaintiff's non-exertional impairments, the VE opined that plaintiff is mildly impaired with regard to activities of daily living, and social functioning and moderately impaired with regard to attention, concentration and pace. There was no evidence of decompensation in a work like setting.  She would be able to perform detailed, non-complex tasks (Tr. 38).

Plaintiff testified that she had last worked on May 28, 2010 as a school bus monitor and that it was her second year to do so.  She worked approximately one and a half hours in the morning and one and a half hours in the afternoon (Tr. 39).  Plaintiff confirmed that she had also worked in customer service as a telemarketer in 2003 and 2004 and had made die for computer chips from 1997 to 2002 and worked in retail in 1993 and 1994.  She had held

other jobs for very short periods of time (Tr. 40).  Plaintiff also had received her GED and completed computer training at a community college (Tr. 41-42).

Plaintiff mostly sleeps when she is at home, but when she is awake she sometimes cooks and does laundry.  Her husband does a lot of housework and does the grocery shopping.  She leaves the house to go to work and makes occasional trips to the store (Tr. 42-43).  She cannot walk on uneven surfaces (Tr. 43).

She sees the doctor every three months.  She takes Savella for fibromyalgia but her body becomes immune to it and it does not always help.  She takes oral medication for diabetes.  She is supposed to be taking insulin, but does not want to inject herself (Tr. 46-47).

She still has a lot of pain and stiffness and being in a cold environment makes it worse.  She has a lot of fat around her liver and it causes her to have pain.  She does not feel good and sleeps most of the time.  She forgets lots of things.  She has approximately two migraine headaches per week and she cannot function.  The neuropathy causes her to have a lot of leg pain, especially on the right.  She also has pain and numbness in her arms and cannot hold them up for very long (Tr. 47-49).

She does not think she could work as a bus monitor for eight hours per day because she cannot sit for that long.  She has to walk around the bus or her legs start to go numb. After working for an hour and a half she goes home and goes to sleep (Tr. 52-53).

She has periods of depression and sadness because of the constant pain and has contemplated suicide because the medication does not help.  She becomes very paranoid and

feels like she cannot breathe.  She cannot stand for a child to sit beside her on the bus because she feels like she is being confined.  She is supposed to sweep the bus and tries to do so, but sometimes she cries because it hurts so much (Tr. 53-54).  She is working so that she will have insurance, but she still cannot afford the co-payments to see a specialist (Tr. 54-55).

The ALJ asked the vocational expert ("VE") to consider an individual who alleged disability at 42 and was currently 48 with a GED plus computer training at a community college.  The person would have the same work history as plaintiff.  She could lift and carry twenty pounds occasionally and ten pounds frequently, could sit, stand and walk for six out of eight hours with normal breaks.  She could not climb ladders, ropes or scaffolds or work at unprotected heights or around dangerous machinery.  Her activities of daily living and social functioning would be mildly restricted and her attention, concentration and pace would be moderately restricted.[4]  She would be capable of understanding, remembering and carrying out detailed but not complex work.  She could make decisions, attend and deal appropriately with workplace peers, bosses and occasional routine work change.  The VE testified that such a person could perform plaintiff's last relevant work as a wafer machine operator which is light and semiskilled with an SVP of 4; a customer service telemarketer

---

[4]The ALJ explained that "mild" means a mild limitation but the person could generally function well.  "Moderate" means greater than mild but less than a marked limitation in this area, but the person is still able to function satisfactorily overall.  "Marked" means a serious limitation in the area, with the ability to function extremely limited but not precluded.  "Extreme"  means a major limitation in the area with no useful ability to function (Tr. 56).

which is sedentary and semiskilled with an SVP of 3 and a bottle filler which is light and unskilled (Tr. 56-56).  Plaintiff's job as a school bus monitor is light and unskilled, but is not considered significant gainful activity because it is only part time (Tr. 57).

If she were to miss more than two days per month she would be subject to termination.  If she were working a full-time job but could not put in an eight-hour day or forty-hour week because she needed to lie down or could not concentrate or focus, she would not be employable (Tr. 58).

Plaintiff did not think she could do any of her former jobs because it is hard for her to remember things.  Also, when she worked as a telemarketer it was very cold in the building and she would stiffen up and be in a lot of pain.  Also, her legs would become numb from sitting.  She would stand up to relieve the numbness and her back would begin to hurt (Tr. 59).  In the chip fabrication job the reaching and carrying caused her a lot of pain, as did the standing.  Also it was very cold, which made her body stiff and hurt (Tr. 60-61).  She could not do the job of bottle filler because she would have to be on her feet all the time .  She could not work full-time as a bus monitor because she cannot sit as long as the job would require (Tr. 61-62).

## LEGAL STANDARDS

Judicial review of the Commissioner's decision regarding a claimant's entitlement to benefits is limited to two questions: (1) whether substantial evidence supports the Commissioner's decision; and (2) whether the decision comports with relevant legal standards.  <u>Carey v. Apfel</u>, 230 F.3d 131, 135 (5th Cir. 2000).  Substantial evidence is "such

relevant evidence as a reasonable mind might accept as adequate to support a conclusion."
Id.;  Richardson v. Perales, 402 U.S. 389, 401, 91 S.Ct. 1420, 1427, 28 L.Ed.2d 842 (1971).
The burden has been described as more than a scintilla, but lower than a preponderance.
Leggett v. Chater, 67 F.3d 558, 564 (5th Cir. 1995).  A finding of "no substantial evidence"
occurs "only where there is a 'conspicuous absence of credible choices' or 'no contrary
medical evidence.'" Johnson v. Bowen, 864 F.2d 340, 344 (5th Cir. 1988)(citations
omitted).

In applying the substantial evidence standard, the Court scrutinizes the record to
determine whether such evidence is present.  But the Court does not reweigh the evidence,
try the issues de novo or substitute its judgment for that of the Commissioner.  Greenspan v.
Shalala, 38 F.3d 232, 236 (5th Cir. 1994)(citations omitted).  It is incumbent upon the Court
to look at the evidence as a whole and take into account the following factors:  (1) objective
medical evidence or clinical findings; (2) diagnosis of examining physicians; (3) subjective
evidence of pain and disability as testified to by the claimant and others who have observed
him and (4) the claimant's age, education and work history.  Wren v. Sullivan, 925 F.2d 123,
126 (5th Cir. 1991)(citations omitted).

In evaluating a disability claim, the Commissioner follows a five-step sequential
process to determine whether (1) the claimant is presently working; (2) the claimant's ability
to work is significantly limited by a physical or mental impairment; (3) the claimant's
impairment meets or equals an impairment listed in the appendix to the regulations; (4) the
impairment prevents the claimant from doing past relevant work; and (5) the claimant cannot

presently perform relevant work.  Martinez v. Chater, 64 F.3d 172, 173-174 (5th Cir. 1995);

20 C.F.R. § 404.1520.  The claimant bears the burden of proof on the first four steps with

the burden shifting to the Commissioner at the fifth step.  Bowling v. Shalala, 36 F.3d 431,

435 (5th Cir. 1994).

## DISCUSSION

In the opinion issued on November 20, 2008, the ALJ went through the five

sequential steps and found that the plaintiff was not disabled because she could do light

work and could return to her previous work as a computer chip machine operator (Tr. 106).

The Appeals Council remanded the case and directed the ALJ to give consideration to the

nonexamining state agency source opinions and to explain the weight given to the opinions;

to assess the functional limitations of plaintiff's severe obesity along with any other

functional limitations resulting from any other physical and mental impairments; to give

further consideration to plaintiff's RFC and provide an appropriate rationale with specific

references to the record in support of the assessed limitations; to further evaluate plaintiff's

subjective complaints and provide a rationale in accordance with the disability regulations

pertaining to the evaluation of symptoms; and, if warranted by the record, to obtain

supplemental evidence from a VE to clarify the effect of the assessed limitations on the

claimant's occupational base (Tr. 111-112).

In the opinion issued on August 10, 2010, the ALJ found that plaintiff met the insured

status requirements through September 30, 2010 and that she had not engaged in substantial

gainful activity since February 1, 2005, her alleged onset date.  Plaintiff had the following

severe impairments, none of which met or equaled in severity a listed impairment either singly or in combination: obesity, diabetes mellitus type II, obstructive sleep apnea, hypothyroidism, fibromyalgia, mild degenerative changes at L5-S1, hypertension, history of Graves' disease, pain disorder associated with both psychological factors and a general medical condition, panic disorder without agoraphobia and a depressive disorder, not otherwise specified (Tr. 11-16).

The ALJ further found that plaintiff could do light work with the additional restrictions of never climbing ladders, ropes or scaffolds or working around unprotected heights or dangerous moving machinery. In addition, plaintiff had mild limitations in activities of daily living and maintaining social functioning and moderate difficulties in maintaining concentration, persistence or pace and no repeated episodes of decompensation. She was able to perform detailed, non-complex tasks, make decisions, attend and deal appropriately with workplace peers and bosses and could adjust satisfactorily to occasional routine work changes. The ALJ concluded that plaintiff could do her past relevant work as a wafer-machine operator, a customer service telemarketer, a bottle filler and a school bus monitor and therefore is not disabled. (Tr. 16-20).

Plaintiff objects to these findings and argues that the ALJ erred when he (1) failed to consider her obesity in making his determination that she did not meet a listing or that she does not have a combination of impairments that meets or medically equals a listed impairment; (2) failed to consider the functional limitations resulting from her obesity when determining her RFC; (3) found that plaintiff has the RFC to do light work; (4) failed to

make a proper credibility determination when discounting plaintiff's subjective complaints and (5) failed to accord proper weight to plaintiff's treating physicians.

### A.  Combination of Impairments

In order to qualify for benefits by showing that an unlisted impairment, or combination of impairments, is equivalent to a listed impairment, a plaintiff must present medical findings equal in severity to all the criteria for the one most similar listed impairment.  Washington v. Barnhart, 424 F.Supp.2d 939, 951 (S.D. Tex. 2006)(citing Sullivan v. Zebley, 493 U.S. 521, 531, 110 S.Ct. 885, 891, 107 L.Ed.2d 967 (1990) and 20 C.F.R. § 416.926(a)).  A claimant's disability is equivalent to a listed impairment if the medical findings are at least equal in severity and duration to the listed findings.  Id. (citing 20 C.F.R. §§ 404.1526(a) and 404.926(a).

The regulations further provide the following:

If you have an impairment that is described in appendix 1, but–

(A) You do not exhibit one or more of the findings specified in the particular listing, or
(B) You exhibit all of the findings, but one or more of the findings is not as severe as specified in the particular listing,
(ii) We will find that your impairment is medically equivalent to that listing if you have other findings related to your impairment that are at least of equal medical significance to the required criteria.

20 C.F.R. § 404.1526(b)(1)(i).  Plaintiff has the burden of showing at step three that her impairment or combination of impairments is equivalent to or greater than a listed impairment.  Washington, 424 F.Supp. at 950(citations omitted).

Plaintiff argues that the ALJ failed to fully consider her obesity in making the determination that she does not have an impairment or combination of impairments that equals a listed impairment.  According to SSR 01-1P, 2000 WL 628049 (SSA)[5] obesity may be a factor in both "meets" and "equals" determinations, even thought there is no listing for obesity by itself.  Obesity may increase the severity of coexisting or related impairments to the extent that the combination of impairments meets the requirements of a listing.  This is especially true when considering musculoskeletal, respiratory and cardiovascular impairments.  Id. at *5.  It may also be true for other coexisting or related impairments, including mental disorders.  Id.

### 1.  Obesity and Musculoskeletal Impairments

When making his determination, the ALJ stated that plaintiff's obesity was considered in evaluating whether plaintiff had a listing level impairment (Tr. 14).  In particular, the ALJ found that plaintiff did not meet the listing for disorders of the spine in 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 1.04.  Plaintiff claims that when her obesity is considered, she does meet the listing because of the pain and stiffness she experiences and because of a positive straight-leg raise she had in 2007, elevated deep tendon reflexes from 2000 to 2002 and burning pain and parathesias that she had in her left leg and arms in 2001 (Tr. 327-336, 354, 487).

---

[5] Social Security Rulings are not binding on the court, but may be consulted when the statute at issue provides little guidance.  The Fifth Circuit has frequently relied upon the rulings in evaluating ALJ decisions.  Myers v. Apfel, 238 F.3d 617, 620 (5th Cir. 2001)(citations omitted).

In order to meet the listing, plaintiff would have to show "[e]vidence of nerve root compression characterized by neuro-anatomic distribution of pain, limitation of motion of the spine, motor loss (atrophy with associated muscle weakness or muscle weakness) accompanied by sensory or reflex loss and, if there is involvement in the lower back, positive straight-leg raising test (sitting and supine)."  20 C.F.R. Pt. 404, Subpt. P, App. 1, §§ 1.04 A.  While plaintiff has had some neuro-anatomic distribution of pain and had a positive straight-leg raising test, there is no evidence of nerve root compression or motor loss.  Moreover, when plaintiff began going to the Amistad clinic in 2008 she reported that Neurontin helped her back pain, although she had stopped taking it because she could not afford it (Tr. 574).  Once she began to take it again, she complained of back pain only one time in the next two years (Tr. 600).  Accordingly, plaintiff has not shown that she met the listing for disorders of the spine, with or without consideration of her obesity.

### 2.  Obesity and Mental Impairments

Plaintiff also argues that when her obesity is considered, she meets the listing for affective disorders and anxiety disorders 20 C.F.R. Pt. 404, Subpt. P, App. 1, §§ 12.04 and 12.06.  However, she does not explain how the obesity causes her to meet the listing. Rather, she argues only that she meets the listings by citing to notes from Dr. Klass's examination and plaintiff's testimony at the second hearing.  Without referring to the criteria of the listings and showing how the evidence supports a conclusion that she meets the criteria, plaintiff cannot show that she is disabled by the combination of obesity and mental health impairments at this stage of the analysis.

### 3. Obesity and Respiratory/Cardiovascular Impairments

Plaintiff contends that the ALJ noted that she has sleep apnea but wrongly determined that she did not meet any listed respiratory condition.  Under the regulations, sleep apneas should be analyzed as part of the listings for pulmonary hypertension and organic mental disorders.  20 C.F.R. Pt. 404, Subpt. P, App. 1 § 3.00I.  Although plaintiff has been diagnosed with hypertension, her blood pressure readings for the most part were "normal" to "pre-hypertension"[6]  once she began receiving treatment at the Amistad health clinic (Tr. 572, 582, 585, 593, 596, 599, 602) and she showed no evidence of cor pulmonale or right-sided heart failure.[7]  See 20 C.F.R. Pt. 404, Subpt. P, App. 1, §§ 300I and 3.09.  Nor was there any evidence that plaintiff suffers from an organic mental disorder.

Plaintiff also asserts that the ALJ failed to give plaintiff's hypertension, hypercholesterolemia and cardiovascular status any weight in making his determination that she did not meet a listing.  However, plaintiff did not discuss any particular listing she believes that she meets or show how the evidence in the record supports a finding that she meets a listing.  Without doing so, she cannot meet her burden of showing that she has a combination of impairments that meets or equals in severity a listed impairment.

---

[6]http://www.nhlbi.nih.gov/hbp/detect/categ.htm (last viewed May 1, 2012).

[7]http://www.ncbi.nlm.nih.gov/pubmedhealth/PMH0001186/ (last viewed May 1, 2012).

### 4.  Fibromyalgia

Plaintiff also asserts that had the ALJ properly considered her fibromyalgia, he would have determined that she met a listing for immune system disorders.  However, plaintiff does not specify which listing she meets or equals and does not discuss the criteria of the listing or point to evidence in the record showing that she meets the listing.  Accordingly, she cannot show that the ALJ erred in determining that her fibromyalgia combined with her other impairments does not meet or equal a listed impairment.

Based on the foregoing, the determination by the ALJ that plaintiff's impairments, either singly or in combination, do not meet the criteria for a listed impairment is supported by substantial evidence.  Plaintiff's arguments to the contrary are without merit.

### B.  Functional Limitations Resulting From Obesity, Plaintiff's RFC and the ALJ's Credibility Determination

Plaintiff's second, third and fourth points are analyzed together, because if the ALJ fully credited plaintiff's subjective complaints, he would have found that she could not sustain employment because of pain in her legs and back caused by obesity, fibromyalgia and degenerative disc disease.  In addition, had he credited her testimony that she is unable to concentrate because of the fatigue and sleepiness caused by her sleep apnea and exacerbated by her obesity, he would have found that she was unable to sustain employment.  Instead the ALJ determined that plaintiff can do light work with additional restrictions.

Plaintiff argues that the ALJ did not consider the effects of obesity when he determined her RFC.  It is noted in SSR 02-1P that obesity can cause limitations of functions

such as sitting, standing, walking, lifting, carrying, pushing and pulling and may affect postural functions such as climbing, balancing and stooping.  In addition, obesity may affect a person's social functioning.  Id. at *6.  The ALJ should assess the effect obesity has on the individual's ability to perform routine movement and necessary physical activity within the work environment.  In addition, the ALJ should consider whether the person has the ability to sustain function over time.  In cases involving obesity, fatigue may affect the person's ability to sustain work activity and this is particularly true in cases involving sleep apnea. Id.

Plaintiff testified that when she sits her legs become numb and when she stands or walks very much she has a lot of back pain and she becomes very stiff (Tr. 60).  She has a lot of pain and numbness in her left arm.  Her leg throbs and burns and her foot sometimes goes numb (Tr. 51).  She is exhausted after her morning shift on the bus and sleeps before the afternoon shift (Tr. 52-53).  When she becomes sleepy, it is not just a feeling of minor fatigue or sleepiness.  Rather she has to fight to stay awake.  Anytime she is relaxed she starts to fall asleep (Tr. 62-63).

The ALJ did not fully credit plaintiff's testimony; therefore his failure to do so must be examined in light of the regulations.  Social Security Ruling ("SSR") 96-7P addresses evaluation of symptoms in disability claims and in particular, the credibility of an individual's statements.  According to the ruling, the ALJ must consider whether there is an underlying medically determinable physical or mental impairment that could reasonably be expected to produce the individual's pain or other symptoms.  The ALJ must next evaluate

the intensity, persistence and limiting effects of the individual's symptoms to determine the extent to which the symptoms limit the individual's abilities to do basic work activities.  If the individual's statements regarding the intensity, persistence or functionally limiting effects of pain or other symptoms are not substantiated by objective medical evidence, the ALJ must consider the entire case record, including medical signs and laboratory findings, the individual's own statements about the symptoms, any statements and other information provided by treating or examining physicians, psychologists or other persons about the symptoms and how they affect the individual and any other relevant evidence.

In recognition of the fact that an individual's symptoms can sometimes suggest a greater level of severity of impairment than can be shown by objective medical evidence, SSR 96-7P sets out the following factors, outlined in 20 C.F.R. 404.1529(c) and 416.929(c), which the ALJ should consider: (1) the individual's daily activities;  (2) the location, duration, frequency, and intensity of the individual's pain or other symptoms;  (3) factors that precipitate and aggravate the symptoms;  (4) the type, dosage, effectiveness, and side effects of any medication the individual takes or has taken to alleviate pain or other symptoms; (5) treatment, other than medication, the individual receives or has received for relief of pain or other symptoms; (6) any measures other than treatment the individual uses or has used to relieve pain or other symptoms, such as lying flat, standing for 15 to 20 minutes every hour or sleeping on a board; (7) any other factors concerning the individual's functional limitations and restrictions due to pain or other symptoms.

Finally, the Ruling sets for the standard for making credibility determinations:

The finding on the credibility of the individual's statements cannot be based on an intangible or intuitive notion about an individual's credibility. The reasons for the credibility finding must be grounded in the evidence and articulated in the determination or decision. It is not sufficient to make a conclusory statement that 'the individual's allegations have been considered' or that 'the allegations are (or are not) credible.' It is also not enough for the adjudicator simply to recite the factors that are described in the regulations for evaluating symptoms. The determination or decision must contain specific reasons for the finding on credibility, supported by the evidence in the case record, and must be sufficiently specific to make clear to the individual and to any subsequent reviewers the weight the adjudicator gave to the individual's statement and the reasons for that weight. This documentation is necessary in order to give the individual a full and fair review of his or her claim, and in order to ensure a well-reasoned determination or decision.

SSR 96-7P, 1996 WL 374186 at *4 (S.S.A.).

In this case, the ALJ stated that plaintiff's medically determinable impairments could reasonably be expected to cause the alleged symptoms, but not to the extent that they would prevent her from doing light work. The ALJ found that plaintiff's continued work activity as a bus monitor, although not at the substantial gainful activity level, detracted from her overall credibility as to allegations of disability (Tr. 17-18). The ALJ also cited to an internal medicine consultative examination where plaintiff was described as being in no acute distress and was not using an assistive device. She was able to get on and off the table without difficulty and her extremities were free of cyanosis, clubbing, edema or varicosities. She had no ulcerations and her peripheral pulses were present. The musculoskeletal exam showed a normal gait and station with no signs of ataxia or unsteadiness (Tr. 18). The ALJ cited to other evidence in the record that her gait and station were smooth and that she was in no acute distress. Plaintiff had a normal physical examination on October 2, 2009 (Id.) In

January 2010 she reported no musculoskeletal problems and her physical exam was normal (Id.).

Regarding her mental impairments, the ALJ cited to Dr. Klass's 2007 report where he found that plaintiff was anxious but presented with effective psychological accessibility. She made eye contact 30 percent of the time and her demeanor was variably anxious. Her comments were clearly articulated, followed an unusual logic, were overly expansive and were negative for looseness in associations. Her comments were positive for tangential references and her abstract thinking was fair (Tr. 19). The ALJ further cited the finding that plaintiff had no delusional or paranoid thinking, was not experiencing hallucinations, her sensorium was clear and she was oriented as to time, place and person. Her immediate memory was maintained. She presented with a fair fund of general knowledge and her judgment was functional (Id.) The ALJ found it noteworthy that there was not a significant amount of mental health treatment records in support of her allegations of a mental disability.

The ALJ in this case articulated his reasons for discounting plaintiff's subjective complaints. While plaintiff is correct that her subjective complaints about the effects of her obesity, fibromyalgia, anxiety and depression indicate that she cannot work at a sustained level, the objective medical evidence is mixed. As discussed above, a finding by a court of no substantial evidence can occur only where there is a conspicuous absence of credible choices or no contrary medical evidence. Johnson, 864 F.2d at 344. In this case there is

objective medical evidence to support the ALJ's conclusion.  Accordingly, his determination

that plaintiff has the RFC to do light work is supported by substantial evidence.

### C.  Credibility of Plaintiff's Treating Physicians

Plaintiff argues that the ALJ should have given controlling weight to the opinions of

her treating physicians but instead relied upon the opinions of non-treating Medical

Examiners.  Under the regulations, the Commissioner is supposed to give more weight to

opinions from treating sources because they are more likely to be the medical professionals

most able to provide a detailed, longitudinal picture of a plaintiff's impairments and might

bring a unique perspective to the medical evidence that cannot be obtained from the

objective medical findings alone or from reports of individual examinations, such as

consultative examinations or brief hospitalizations.  If the treating physician's opinion on the

nature and severity of an impairment is well-supported by medically acceptable clinical and

laboratory diagnostic techniques and is not inconsistent with the other substantial evidence

in the case record, the Commissioner is supposed to give it controlling weight.  If he does

not give it controlling weight, he is supposed to look at the length, nature and extent of the

treating relationship, the frequency of examination, the support provided by other evidence,

the consistency of the opinion with the record as a whole and the specialization of the

treating physician.  20 C.F.R. § 404.1527(d).

The ALJ can decrease reliance on treating physician testimony for good cause, which

includes statements that are brief and conclusory, not supported by medically acceptable

clinical laboratory diagnostic techniques or otherwise unsupported by evidence.  <u>Leggett v.</u>

Chater, 67 F.3d 558, 566 (5th Cir. 1995)(citations omitted).  However, absent reliable

medical evidence from a treating or examining physician controverting the claimant's

treating physician, an ALJ may reject the opinion of the treating physician *only* if the ALJ

performs a detailed analysis of the treating physician's view under the criteria set forth in 20

C.F.R. § 404.1527(d)(2).  Newton v. Apfel, 209 F.3d 448, 453 (5th Cir. 2000)(emphasis in

original).

Although plaintiff asserts that the ALJ failed to give proper credit to the opinion of

her treating physicians, she does not specify to which physicians, or to which opinions she is

referring.  Nothing in the records from the Amistad clinic indicates that plaintiff's

impairments would keep her from working.  Indeed, after she began taking Neurontin again

in 2008 she rarely complained of pain in her extremities (Tr. 569, 572, 574, 581, 584, 588,

592, 595, 598, 601).  Nor is there evidence from her other treating physicians to support her

contention that she is disabled.  The medical information provided by plaintiff's treating

physicians is consistent with the conclusions of the medical experts and the ALJ's decision

to rely on the testimony of the medical experts is consistent with the regulations.

Although it is clear that plaintiff suffers pain and discomfort from her various

ailments, the ALJ's conclusion that she is not disabled under the Social Security statutes and

regulations is supported by substantial evidence.  Accordingly, it is recommended that he

determination that plaintiff is not disabled be affirmed.

## <u>RECOMMENDATION</u>

The Commissioner's determination that plaintiff is not disabled is supported by substantial evidence.  It is respectfully recommended that plaintiff's motion for summary judgment (D.E. 11) be denied, and the Commissioner's determination that plaintiff is not disabled be affirmed.

Respectfully submitted this 4th day of May, 2012.

_____
B. JANICE ELLINGTON
UNITED STATES MAGISTRATE JUDGE

**NOTICE TO PARTIES**

The Clerk will file this Memorandum and Recommendation and transmit a copy to each party or counsel.  Within **FOURTEEN (14) DAYS** after being served with a copy of the Memorandum and Recommendation, a party may file with the Clerk and serve on the United States Magistrate Judge and all parties, written objections, pursuant to Fed. R. Civ. P. 72(b), 28 U.S.C. § 636(b)(1), General Order No. 2002-13, United States District Court for the Southern District of Texas.

A party's failure to file written objections to the proposed findings, conclusions, and recommendation in a magistrate judge's report and recommendation within FOURTEEN (14) DAYS after being served with a copy shall bar that party, except upon grounds of *plain error,* from attacking on appeal the unobjected-to proposed factual findings and legal conclusions accepted by the district court.  Douglass v. United Servs. Auto Ass'n, 79 F.3d 1415 (5th Cir. 1996)(en banc).